1    **WO**                                                              SVK

2

3

4

5

6                **IN THE UNITED STATES DISTRICT COURT**

7                     **FOR THE DISTRICT OF ARIZONA**

8

9    Albert L. Brinkman,                  )    No. CV 06-0512-TUC-CKJ
                                          )
10              Plaintiff,                 )    **ORDER**
                                          )
11   vs.                                  )
                                          )
12                                        )
     Dora B. Schriro, et al.,             )
13                                        )
                Defendants.               )
14                                        )
     _____ )
15

16          Plaintiff Albert L. Brinkman, who is confined at the Arizona State Prison Complex

17   (ASPC)-Tucson, filed this civil rights action against various officials of the Arizona

18   Department of Corrections (ADC). (Doc. #1.) The remaining Defendants—former Director

19   Schriro; Central Office medical administrators Kendal and Baird; Facility Health

20   Administrators (FHA) Pratt and Chenail; and prison physicians White and

21   Macabuhay[1]—move for summary judgment on the remaining claims, and the motion is fully

22   briefed.[2]   (Doc. ##172, 182, 185.)

23          The Court will grant the motion and terminate the action.

24   ///

25

26          _____

27          [1] (Doc. #173, Defendants' Statement of Facts (DSOF) ¶¶ 3-9.)

28          [2] The Court sent Plaintiff a Notice pursuant to <u>Rand v. Rowland</u>, 154 F.3d 952, 962
     (9th Cir. 1998), advising Plaintiff of his obligation to respond.  (Doc. #174.)

# I.    Background

In Count III of the First Amended Complaint, Plaintiff alleged a denial of medical and dental care.  (Doc. #6.)  He claimed that from the time he was confined at ASPC-Lewis and later in ASPC-Tucson, he was denied routine dental care and medical care for various medical problems.  (Id.)  Later, Plaintiff moved to file a Second Amended Complaint and Supplemental Pleading; the Court granted the motion only insofar as it permitted Plaintiff to file a Supplemental Pleading.  (Doc. #119.)  In his Supplemental Pleading, filed in September 2008, Plaintiff made additional claims of deliberate indifference in denying medical treatments and items.  (Doc. #118.)  The Supplemental Pleading added White and Macabuhay as Defendants.  (Doc. #119.)

Defendants previously moved to dismiss on the grounds of statute of limitations and failure to exhaust administrative remedies.  (Doc. #140.)  The Court held that claims accruing prior to September 26, 2004 were time barred.  (Doc. #171.)  The Court also determined that the remaining claims were those in the First Amended Complaint alleging deliberate indifference as to the treatment of his cavities and a lost filling and the claims in the Supplemental Pleading for denial of supportive, non-slip shower shoes, a new mattress, front cuffing, and proper fitting footwear—all to address alleged spinal and foot problems; heart problems related to providing the angiogram; and bowel problems related to providing an endoscopy and colonoscopy.[3]  (Id.)

Defendants move for summary judgment on the grounds that (1) they did not deny Plaintiff medical care and (2) they are entitled to qualified immunity.  (Doc. #172.)

# II.    Legal Standards

## A.    Summary Judgment

A court must grant summary judgment if the pleadings and supporting documents, viewed in the light most favorable to the non-moving party, "show that there is no genuine

---

[3]The Court dismissed Count II of the Amended Complaint on screening.  (Doc. #21.)  The Court subsequently dismissed Counts I, IV and V.  (Doc. ##64, 77.)  The remainder of Count III and Count II of the Supplemental pleading were dismissed in response to Defendants' Motion to Dismiss.  (Doc. #171.)

issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). Under summary judgment practice, the moving party bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, which it believes demonstrate the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party who must demonstrate the existence of a factual dispute and that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the non-moving party. Id. at 250; see Triton Energy Corp. v. Square D. Co., 68 F.3d 1216, 1221 (9th Cir. 1995). Rule 56(e) compels the non-moving party to "set out specific facts showing a genuine issue for trial" and not to "rely merely on allegations or denials in its own pleading." Fed. R. Civ. P. 56(e); Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). The opposing party need not establish a material issue of fact conclusively in its favor; it is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." First Nat'l Bank of Arizona v. Cities Serv. Co., 391 U.S. 253, 288-89 (1968). However, Rule 56(c) mandates the entry of summary judgment against a party who, after adequate time for discovery, fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which the party will bear the burden of proof at trial. Celotex, 477 U.S. at 322-23.

When considering a summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any. Fed. R. Civ. P. 56(c). At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. Anderson, 477 U.S. at 249. The evidence of the non-movant is "to be believed, and all

justifiable inferences are to be drawn in his favor." Id. at 255. But, if the evidence of the non-moving party is merely colorable or is not significantly probative, summary judgment may be granted. Id. at 248-49.

## B.    Medical Claims

To prevail on a claim under the Eighth Amendment for prison medical care, a prisoner must demonstrate "deliberate indifference to serious medical needs." Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006) (citing Estelle v. Gamble, 429 U.S. 97, 104 (1976)). A plaintiff must show (1) a "serious medical need" by demonstrating that failure to treat the condition could result in further significant injury or the unnecessary and wanton infliction of pain and (2) the defendant's response was deliberately indifferent. Jett, 439 F.3d at 1096 (citations omitted). To act with deliberate indifference, a prison official must both know of and disregard an excessive risk to inmate health; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. Farmer v. Brennan, 511 U.S. 825, 837 (1994). Deliberate indifference in the medical context may be shown by a purposeful act or failure to respond to a prisoner's pain or possible medical need and harm caused by the indifference. Jett, 439 F.3d at 1096.

But mere claims of "indifference," "negligence," or "medical malpractice" do not support a claim under § 1983. Broughton v. Cutter Laboratories, 622 F.2d 458, 460 (9th Cir. 1980). Inadequate treatment due to malpractice or even gross negligence does not constitute an Eighth Amendment violation. Wood v. Housewright, 900 F.2d 1332, 1334 (9th Cir. 1990). Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. Moreover, differences in judgment between an inmate and prison medical personnel regarding an appropriate medical diagnosis or treatment are not enough to establish a deliberate indifference claim. Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1996).

///

## C. Qualified Immunity

A defendant in a § 1983 action is entitled to qualified immunity from damages for civil liability if his or her conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). In Saucier v. Katz, 533 U.S. 194, 201 (2001), the Supreme Court mandated a two-step sequence for resolving a qualified immunity claim: the "constitutional inquiry" and the "qualified immunity inquiry." The "constitutional inquiry" asks whether, when taken in the light most favorable to the non-moving party, the facts alleged show that the official's conduct violated a constitutional right. Id. If so, a court would turn to the "qualified immunity inquiry" and ask if the right was clearly established at the relevant time. Id. at 201-02. This second inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." Id. at 201. "The relevant, dispositive inquiry . . . is whether it would be clear to a reasonable officer that his conduct was unlawful *in the situation he confronted*." Id. at 202 (emphasis added).

In Pearson v. Callahan, 129 S. Ct. 808, 818 (2009), the Supreme Court held that the Saucier procedure is not an inflexible requirement; judges "should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."

## III. Motion for Summary Judgment

### A. Parties' Contentions

#### 1. Defendants

In support of their motion, Defendants submit their Statement of Facts (Doc. #173 (DSOF)); the affidavit of Dr. Richard Rowe (id., Rowe Aff.); the affidavit of Dr. Adu-Tutu, with attachments (Doc. #139, Ex. D, Adu-Tutu Aff.); and Plaintiff's ADC medical records (id. Ex. C).

Defendants assert that Plaintiff was transferred to ADC on an interstate compact from Kansas on January 21, 1998. (Doc. #140 at 2; Doc. #139, Baird Aff. ¶ 4.) Plaintiff lived at the ASPC-Lewis from November 17, 1999, to November 15, 2005, when he was transferred

to ASPC-Tucson. According to Defendants, Plaintiff returned to ASPC-Lewis from January 14, 2008, to October 30, 2008, and then was transferred back to the Tucson prison, where he currently resides. (Doc. #140 at 2; Doc. #139 Baird Aff. ¶ 5.)

Defendants assert that Plaintiff received consistent and appropriate care for his medical and dental problems. (Doc. #172 at 4.) Defendants contend that despite advice from ADC medical professionals, Plaintiff smoked a pack of cigarettes a day and was also overweight, which caused and exacerbated his hypertension, low back pain, and related medical issues. (DSOF ¶ 10.) They note that Plaintiff asserts claims regarding spinal and foot problems, alleging denial of non-slip shower shoes, a new mattress, front cuffing, and proper-fitting footwear. Defendants contend that Plaintiff did not submit any Health Needs Requests (HNRs) complaining about back pain. (Id. ¶ 11.) A radiologist concluded from an x-ray taken on April 21, 2006, that Plaintiff had degenerative and discogenic degenerative disc disease, specifically narrowing of the L4-5 and L5-S1 disc spaces. (Id. ¶ 12.) Discogenic pain originates from a damaged vertebral disc, particularly due to degenerative disc disease, but not all degenerated discs cause pain. Disc degeneration occurs naturally with age and being overweight can contribute significantly to low back pain with degenerative disc disease. (Id.)

When Plaintiff complained of foot pain, he was treated for fungus and told to cut his long toenails. (Id. ¶ 13.) At least once, in November 2007, he was provided a pair of tennis shoes by medical. In June 2008, he was diagnosed with mild bunions, an arthritic condition in the great toe. Under current medical criteria, ADC inmates are not provided tennis shoes for bunions but they can purchase tennis shoes at the inmate store. (Id.)

Defendants assert that Plaintiff was consistently given Special Needs Orders (SNO) for a lower bunk and front cuffing. (Id. ¶ 14, Doc. #139, SNOs in medical records: Bates 0027, 0028, 0132, 0135, 0136, 0137, 0138.) A medical provider also wrote a SNO for a new mattress, which is unusual since bedding is normally provided by security personnel, not medical. Defendants contend that no SNOs were written for "non-slip" or any other shower shoes as medical does not issue any sort of shower shoes; inmates receive from security a

pair of shower shoes when they enter ADC, and inexpensive shower shoes are also available for purchase from the inmate store.  (Id.)

Plaintiff also alleged deliberate indifference regarding providing an angiogram for his heart problems.  Defendants assert that Plaintiff was monitored on a regular basis and treated with medications for chronic hypertension (high blood pressure).  (Id. ¶ 15.)  He underwent diagnostic testing (EKG) after he complained of shortness of breath, arrhythmia and palpitations beginning in August 2007.  (Id.)  Plaintiff received blood pressure medications and his vital signs, which were checked regularly, remained stable.  As required under the Interstate Compact Agreement for specialty care, approval was obtained from Kansas, and Plaintiff was seen by a cardiologist.  Per the cardiac specialist's recommendation, Plaintiff was taken to St. Mary's Hospital for an angiogram; from the test the cardiologist determined that Plaintiff has mild coronary artery disease and that surgical intervention was not indicated.  He was continued on medications.  (Id.)

Plaintiff also alleged bowel problems and denial of an endoscopy and colonoscopy. Plaintiff had a history of hemorrhoids, a condition in which the veins around the anus or lower rectum are swollen and inflamed. Hemorrhoids usually are not dangerous or life threatening, and in most cases, hemorrhoidal symptoms will go away within a few days.  The most common symptom of internal hemorrhoids is bright red blood covering the stool, on toilet paper, or in the toilet bowl.  (Id. ¶ 16.)

Plaintiff complained of hemorrhoids and was provided cream, medicated pads, witch hazel, and extra toilet paper. He refused a diagnostic exam by an ADC provider on at least one occasion. When Plaintiff complained of rectal bleeding and told the provider that his mother had colon cancer and a colostomy, the provider immediately wrote a consult request for a gastrointestinal work-up. Because Plaintiff's home state refused to authorize the recommended special care, ADC assumed the cost of Plaintiff's colonoscopy and endoscopy. The procedures were not urgent in any event.  (Id. ¶ 17.)

The gastroenterologist removed a couple of small polyps from Plaintiff's rectum and

noted a small ulcer; the results were otherwise unremarkable. Plaintiff was provided medication to address the small ulcer that was discovered during the exams. (Id. ¶ 18.)

Plaintiff also raised claims regarding deliberate indifference to his dental needs. Defendants assert that Plaintiff was initially housed at ASPC-Lewis and then transferred to ASPC-Tucson on November 15, 2005. (Id. ¶ 19.) On September 28, 2004, Dr. Grant, D.D.S. saw Plaintiff to continue his treatment plan. Grant recommended but Plaintiff refused to have tooth # 30 extracted and he asked for a filling on a different tooth. (Id. ¶ 20.) Grant replaced a defective filling on tooth # 11 and advised Plaintiff of his gum problem and gave him home-care instructions. (Id.) On February 7, 2005, Dr. Krebs received an HNR dated February 4, 2005, from Plaintiff requesting an updated examination and treatment plan. (Id. ¶ 21.) Dr. Sears saw Plaintiff on February 11, 2005, for the updated examination and treatment plan. Sears also offered to extract tooth # 30 but Plaintiff refused. (Id.)

On February 14, 2005, Grant received an HNR dated February 11, 2005, from Plaintiff requesting to get his tooth fixed. Grant advised Plaintiff that he would be put on the routine care list. (Id. ¶ 22.)

On September 19, 2005, Krebs received an HNR dated September 17, 2005, for emergency pain. (Id. ¶ 23.) Krebs saw Plaintiff that same day and prescribed pain medications and antibiotics. (Id.) Krebs rescheduled Plaintiff for the extraction of tooth # 30. On September 29, 2005, Plaintiff was scheduled for the extraction. Plaintiff refused treatment and refused to sign the refusal form to acknowledge his intentions. (Id.)

Plaintiff submitted a second HNR dated September 17, 2005, and another one dated September 18, 2005, for pain and stating that he was on a hunger strike. Nurse Hoffman saw Plaintiff on September 21, 2005, at which time Plaintiff advised Hoffman that the "penicillin" had already helped. Plaintiff was further advised to continue to notify medical and/or dental if any difficulty developed. (Id. ¶ 24.)

///

///

1    On September 20, 2005, Krebs received an HNR dated September 18, 2005, from

2    Plaintiff for pain.  Krebs responded that Plaintiff was seen on September 19, 2005.  (Id. ¶ 25.)

3    On October 6, 2005, Grant submitted a consultation request, through ADC Health

4    Services Medical Review Process, to Plaintiff's sending state, Kansas, for an outside-

5    specialist evaluation of tooth # 30.  (Id. ¶ 26.)  Because Plaintiff is in ADC on an Interstate

6    Compact Agreement with Kansas, ADC is required to obtain prior authorization from Kansas

7    for specialty medical and dental care.  Plaintiff did not meet ADC's procedure guidelines for

8    root canal treatment on tooth # 30.  (Id.)  On November 2, 2005, Plaintiff's sending state

9    denied the October 6, 2005, consultation request.  (Id. ¶ 27.)

10   On November 15, 2005, Plaintiff was transferred to ASPC-Tucson.  (Id. ¶ 28.)  On

11   November 17, 2005, ASPC-Tucson dental staff received an HNR from Plaintiff dated

12   November 15, 2005, for examination and treatment plan.  (Id. ¶ 29.)  Dr. Rihanek, D.D.S.

13   saw Plaintiff on December 2, 2005.  Rihanek advised Plaintiff that tooth # 30 did not qualify

14   for root canal treatment.  Plaintiff was advised to submit an HNR for his next visit.  (Id.)

15   Dr. Paulley, D.D.S., Dentist Supervisor at ASPC-Tucson, received an inmate letter

16   from Plaintiff dated December 15, 2005, stating that he needed his tooth fixed.  (Id. ¶ 30.)

17   On December 15, 2005, Paulley examined Plaintiff regarding treatment for tooth number 30.

18   (Id. ¶ 31.)  On January 17, 2006, Paulley requested a policy waiver from the ADC dental

19   director to perform root canal treatment on tooth # 30.   (Id. ¶ 32.)  The dental director

20   granted the waiver and on February 7, 2006, Paulley started the root-canal treatment. Plaintiff

21   was rescheduled for further work on the tooth; his appointment on February 28, 2006, was

22   rescheduled.  (Id.)

23   On March 7, 2006, Paulley finished the root canal treatment on tooth #30, placed a

24   filling in the tooth, and advised Plaintiff that he would need re-evaluation for a temporary

25   crown.  (Id. ¶ 33.)  Paulley further advised him to submit an HNR for the next visit

26   appointment.  (Id.)

27   ///

28   ///

Plaintiff was housed at ASPC-Tucson until his transfer back to ASPC-Lewis on January 14, 2008; there is no record of any dental request or communication to the dental staff from Plaintiff on his dental care during this time frame.  (Id. ¶ 34.)

Based on the clinical findings of the dentists who examined Plaintiff, as noted by the symptoms that he presented, the recommended extraction of tooth # 30 was appropriate.  (Id. 35.)  Paulley's opinion on the treatment plan for tooth # 30 differed somewhat from the other dentists who had treated Plaintiff, and when she examined Plaintiff, Paulley was not able to determine definitively that the tooth was salvageable.  Accordingly, there was an interval of time before placing a temporary crown on tooth #30.  Plaintiff subsequently received a more permanent crown on tooth # 30.  On November 26, 2008, Dr. Lucas placed a "temporary" crown on tooth # 30.  (Although it was labeled a "temporary" crown—as opposed to a custom-made crown—the crown is a prefabricated, functional tooth covering that the dentist modifies to fit the patient's mouth.  It is cemented to the remaining tooth structure.)  (Id.)

As stated, Defendants assert that Plaintiff was provided appropriate care for his health problems.  They also contend that they are entitled to qualified immunity because they could reasonably believe that their conduct in addressing Plaintiff's medical and dental needs was in conformance with the law because they did not ignore a serious risk to his health.  (Doc. #172 at 4-5.)

### 2.  Plaintiff

In opposition, Plaintiff submits his response (Doc. #182); his Statement of Facts (Doc. #183, PSOF); and his declaration, with attachments (Doc. #184).

Plaintiff agrees that he did not submit any HNRs specifically complaining about back pain, but he argues, generally, that his records document degenerative disc disease and that he complained to health care providers about foot pain, altered gait, loss of balance, and sleep deprivation.  (Doc. #182 at 8; Doc. #183, PSOF ¶ 11.)

Plaintiff asserts that the tennis shoes provided in November 2007 were first prescribed on June 7, 2006 and these were replacements for shoes that did not fit him.  (Doc. #182 at 14; PSOF ¶ 13.)  He claims that the "delay was for a variety of non-medical reasons." (Doc.

#182 at 14.) He also contends that "Defendants do not mention the complete lack of properly-fitting state-issued footwear." (Id., citing to Supplemental Pleading Doc. #118.) He disputes Defendants' assertion that "medical" does not issue shower shoes, claiming that another inmate—Jack R. Olsen, ADC 108886—was given non-skid shower shoes and that this was facilitated by Chenail. (PSOF ¶ 14.) And he disputes Defendants' claim that because no one issued an SNO for such shoes, no health care provider recommended them; in fact, Macabuhay sent a request to the Medical Review Committee for, among other items, shower shoes. (Id., Doc. #139, Ex. C, Bates ## 0045-46.)

In PSOF, he agrees that he was consistently given SNOs for a lower bunk and front-cuffing and that a medical provider wrote an SNO for a new mattress. (PSOF ¶ 14.) But in his response, he argues that SNOs, except for the lower bunk, were not provided consistently; instead, they were "denied, delayed, and/or went unfilled." (Doc. #182 at 9.) He alleges that Defendant implemented a policy of not honoring previously issued SNOs that were for the duration. (Id.) Specifically, he argues that Macabuhay "inexplicably kiboshed" his SNOs for a lower bunk and front cuffing. (Id., Doc. #139, Ex. C, Bates #0047.)

As to his bowel problems, Plaintiff assets that the gastroenterologist recommended that the polyps be biopsied but that has not been done, despite Plaintiff's family history of colon cancer. (PSOF ¶ 18.) Plaintiff asserts that as a result, he has suffered mental anguish and emotional distress. (Id.) Plaintiff also asserts that he was diagnosed with diverticulosis and has painful bowel movements but Defendants have failed to provide treatment. (Doc. #182 at 20, ref. Doc. #173, Rowe Aff. at 22.)

Plaintiff disputes the assertion that he received medication on a regular basis. (Id. ¶ 37.) He claims that Defendants often deprived him of medication, leaving him in unnecessary pain. Plaintiff asserts that he attempted to remedy this by verbal and written complaints to ADC security and medical staff, including Defendants. (Id., Exs. 1N-1U.) He contends that the responses would eventually rectify the particular failure, only to have the problem recur later. He complains that Defendants do not provide pharmacy records, so the

medical records cannot demonstrate what was prescribed and if and when it was filled, refilled, and renewed in a timely manner. (Id. at 4, n.4.)

In PSOF, Plaintiff asserts that security staff are the providers of bedding, i.e. mattresses, only in the technical sense. (Id. ¶ 38.) Security issues the mattress after it is prescribed by a health care provider. (Id.) He asserts that he was completely denied a supportive mattress from September 26, 2004, until June 2, 2006, when the SNO for the new mattress was issued and that even then it was two more months before it was provided. (Doc. #182 at 11-12.) "This delay was the result of Defendants' policy and custom of delegating the task of providing inmates medically prescribed bedding to the unit's security staff. . . . This same policy and custom prevented [Plaintiff] from being provided a replacement new/medical mattress when the one (and only one) he had/has received from Defendants went missing." (Id.) He argues that a jury could infer that Defendants were making medical judgments based on budgetary concerns. (Id. at 12.) Plaintiff also asserts that the June 7, 2006 SNO for a mattress was revoked in the same manner as the front-cuffing SNO. (Id. at 13.)

In his declaration, Plaintiff addresses the replacement mattress. Plaintiff alleges that he had a "medical mattress" from August 3, 2006, until December 1, 2007, when it disappeared at the time inmates were moved from one unit to another at the ASPC-Tucson. (Doc. #184, Pl's. Decl. ¶ 12.) He asserts that he submitted an HNR for a replacement but was refused by medical. (Id.) Plaintiff also claims that he saw Macabuhay on January 31, 2008, after Plaintiff was transferred to ASPC-Lewis. Macabuhay's plan was to submit to the Medical Review Committee SNOs for a lower bunk, front cuffing, new mattress, new shoes, and non-skid shower shoes. Plaintiff ultimately filed grievances on the matter and was advised by Schriro on June 12, 2008 that his requests had been denied because "based on your most recent exams by your Health Care Provider, it was determined that you currently do not medically require these Special Needs Orders." (Doc. #184, Ex. E9.) He argues that Defendants "sans White and Chenail should be denied summary judgment regarding [Plaintiff's] mattress claims from January 14, 2008 to October 30, 2008. (Doc. #182 at 13.)

### 3. Reply

Defendants assert that Plaintiff argues that prison medical providers and administrators were deliberately indifferent for not giving him enough over-the-counter medications, a nail clipper, and $3.00 shower shoes that he could have purchased at the inmate store. (Doc. #185 at 1, ref. Ex. A, ADC Department Order 909, Inmate Property, Attachment A, Inmate Store/Property List.) They contend that Plaintiff has failed to demonstrate a triable issue of fact and that the record shows that he received care. (Id. at 4-5.) They note that Plaintiff claims that the Defendants were deliberately indifferent to his spinal and foot problems (by denying him non-slip shower shoes, a new mattress, front cuffing, and proper-fitting footwear) but admits that he did not submit any HNRs regarding back pain. (Id. at 5.) And he does not dispute that he could have purchased over-the-counter medications and aids, including medication for pain (acetaminophen, ibuprofen, and aspirin), from the inmate store. (Id. at 6, Doc. #139-3 at 46: Items for Sale at Inmate Store including acetaminophen, ibuprofen, and aspirin.) Plaintiff received footwear, including shower shoes; he alleges that it did not fit him properly. (Id..) The record reflects that shower shoes are standard issue (by security) and that Plaintiff could have purchased them from the inmate store. (Id.)

Defendants maintain that the record is devoid of any evidence to support a finding that they caused Plaintiff the requisite sufficiently serious injury or that any of them had the culpable state of mind necessary for an Eighth Amendment violation. (Id. at 7.) They argue that Plaintiff has failed to come forth with any evidence of injury attributable to Defendants or that each of the Defendants knew of and disregarded a serious risk to his health and safety, that they were deliberately indifferent. (Id. at 9.) They further argue that *respondeat superior* is not a viable basis for liability under § 1983.

### B. Analysis

First, the Court notes that neither party has done what it should to clarify the record for the Court regarding the numerous complaints made by Plaintiff. Defendants submit a SOF and cite generally to the Rowe affidavit for support. But the Rowe affidavit is 26 pages

long, and DSOF fails to cite to any particular paragraphs in the affidavit, requiring the Court to search through the document. And Defendants did not reply to many of Plaintiff's assertions in his response as to the SNOs. Likewise, Plaintiff, who has complained about virtually every facet of his medical care since 1999, provides a vague and at times confusing account of events.

### 1. Dental Claims

The Court will grant summary judgment to Defendants regarding Plaintiff's claims that Defendants were deliberately indifferent to his medical needs concerning his dental issues. Defendants provide evidence that they responded to Plaintiff's dental needs and provided treatment, although it may not have been the treatment Plaintiff wanted. Differences in judgment between an inmate and prison medical personnel regarding an appropriate medical diagnosis or treatment are not enough to establish a deliberate-indifference claim. Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1996). Summary judgment is appropriate when a party fails to make a showing sufficient to establish the existence of an element essential to his case and on which he would have the burden of proof at trial. Celotex Corp., 477 U.S. at 322-23. Plaintiff has the burden of proof on standard of care—he must provide competent evidence that Defendant's treatment fell below the standard of care—and expert medical testimony is generally required to establish standard of care. It was incumbent upon Plaintiff to provide an affidavit or deposition of an expert to establish standard of care. See Hutchinson v. United States, 838 F.2d 390, 393 (9th Cir. 1988) (granting summary judgment against a plaintiff who relied only on her own allegations and conclusory statements that defendants had been negligent and who failed to provide affidavits or depositions of experts).

Here, Plaintiff does not dispute any of Defendants' assertions regarding their treatment of his dental problems or even address the dental claims. (DSOF ¶¶ 19-36; PSOF ¶¶ 19-36.)

///

///

- 14 -

### 2.	Heart

The Court will grant summary judgment to Defendants regarding Plaintiff's claims that Defendants were deliberately indifferent to his medical needs concerning an angiogram. Defendants proffer evidence that they provided diagnostic testing and that the cardiac specialist found mild coronary disease and no need for surgery. As with the dental claims, Plaintiff does not dispute any of Defendants' assertions regarding their treatment of his heart problems or even address the claims. (DSOF ¶ 15; PSOF ¶ 15.)

### 3.	Bowel

The Court will grant summary judgment as to Plaintiff's complaints regarding Plaintiff's bowel problems, including his endoscopy and colonoscopy. Defendants proffer evidence that they provided treatment for hemorrhoids and that they assumed the cost of his endoscopy and colonoscopy, which showed "unremarkable" results. Plaintiff does not dispute this. The Court finds that the complaints regarding the biopsy and treatment of diverticulosis are beyond the scope of the Supplemental Pleading. (Doc. #118 at 5M, Count II ¶ 3.)

### 4.	Medication

The Court will grant summary judgment as to Plaintiff's claims regarding denial of medication. It appears to the Court that Plaintiff was prescribed Ibuprofen as pain medication for his back and feet. Defendants concede that Plaintiff has degenerative disc disease but assert that not all degenerated discs cause pain. They also assert that Plaintiff did not submit any HNRs complaining of back pain or pain medication. Plaintiff does not dispute this but asserts that he submitted numerous grievances regarding non-receipt of his pain medications. (Doc. #184, Exs. N1-U1.)

As some of the responses to these grievances show, Plaintiff had been given pain medication for specific periods, was advised that his medication was not on auto-refill, and that he needed to submit HNRs for refills. (Id., Ex. N2, Inmate Letter Response, dated August 23, 2007.) Because not all degenerative discs cause pain, it is not deliberate indifference for a health care provider to wait for a patient's complaint of pain before

prescribing medication. Plaintiff concedes that when he complained, the medication problem was rectified. Plaintiff does not show that the named Defendants who could prescribe pain medication failed to do so when requested. And the lack of pharmacy records is irrelevant because Plaintiff offers no evidence linking the named Defendants to any failure to actually fill the prescriptions.

### 5.    Special Needs Orders

#### *(a)    Front-Cuffing and Lower Bunk SNOs*

Plaintiff has both agreed that SNOs were consistently provided and disputed that assertion. As to his allegation that SNOs, except for the lower bunk, were not provided consistently but were "delayed and/or went unfilled," Plaintiff provides nothing but a conclusory statement and offers no evidence that Defendants' conduct caused such delays or non-compliance. See Rizzo v. Goode, 423 U.S. 362, 371-72, 377 (1976) (to prevail on a claim under § 1983, a plaintiff must establish that he suffered a specific injury as a result of specific conduct of a defendant and show an affirmative link between the injury and the conduct of that defendant). To the extent Plaintiff is suggesting that Defendants are liable as supervisors, there is no *respondeat superior* liability under § 1983, and, therefore, a defendant's position as the supervisor of persons who allegedly violated Plaintiff's constitutional rights does not impose liability. See Monell v. New York City Department of Social Services, 436 U.S. 658, 691-92 (1978).

Plaintiff's only specific allegation of denial is that Macabuhay "kiboshed" his SNOs for a lower bunk and front-cuffing. But the medical entry cited by Plaintiff shows that Macabuhay noted that he had reviewed the chart and that the reason for these SNO was not documented. (Doc. #139, Ex. C., Bates #0047.) That is insufficient to show deliberate indifference, which requires that a defendant be aware of a serious risk of harm. The note indicates that Macabuhay was not aware of a risk of harm, as the need was not documented. Moreover, Plaintiff's evidence shows that Macabuhay, in fact, requested SNOs for front-cuffing and a lower bunk. And it appears that the SNO for the lower bunk was approved. (Doc. #184, Ex. D2, Inmate Communique, dated February 19, 2008.)

Although Defendants assert that these SNOs were provided consistently, Plaintiff's evidence shows that Macabuhay's request for various SNOs, including front cuffing were, in fact, denied. Plaintiff ultimately filed grievances and was advised by Schriro on June 12, 2008 that his requests for front cuffing, a new mattress, medical shoes, non-skid shower shoes, and extra toilet paper had been denied because "based on your most recent exams by your Health Care Provider, it was determined that you currently do not medically require these Special Needs Orders." (Doc. #184, Ex. E9.)

Assuming that Plaintiff is entitled to a favorable inference because he was at some time given SNOs for front-cuffing, that is still insufficiently probative to defeat summary judgment. Anderson, 477 U.S. at 248-49 (if the evidence of the non-moving party is merely colorable or is not significantly probative, summary judgment may be granted). Providing a SNO at one point in time does not establish that a particular medical problem requires the SNO in perpetuity. But most important, without more, the SNO is not evidence that Plaintiff was ever at serious risk of injury without it or that any Defendant knew of a serious risk and ignored it. Plaintiff does not even explain why he believes the front-cuffing was necessary or assert that he was harmed by regular cuffing.

### (b)    Shoes

The Court will grant summary judgment as to the issues regarding SNOs for shoes.

Plaintiff contends that Defendants do not address the "complete lack of properly-fitting state-issued footwear," referring to his Supplemental Pleading and citing Doc. #118 e.g. 5-5G ¶ 3 . In his Supplemental Pleading, Plaintiff alleged that he "had no foot problems until his arrival at Lewis Complex, where prison officials issued [him] the wrong size boots (too small), refused to obtain proper footwear, and caused Plaintiff foot injuries." (Doc. #118 at 5 ¶ 3.) The Supplemental Pleading also indicates that this happened in 1999. (Id. at ¶ 13.) There is nothing in the Supplemental Pleading or Plaintiff's response to the summary judgment motion that links these Defendants to his complaint regarding the too-small boots initially provided, and the claims are barred by the statute of limitations. (Doc. #171.)

As to the medical shoes, the Court first notes that it is unclear what Plaintiff means by medical shoes.  Plaintiff does not appear to claim that he needs orthopedic shoes, and he does not point to anything in the record indicating that a medical provider recommended or ordered orthopedic shoes.  Thus, it is unclear to the Court what connection any medical provider would have to Plaintiff's footwear.  On the other hand, Defendants assert that a pair of tennis shoes was provided to Plaintiff by medical in November 2007, and there is some indication that tennis shoes are what Plaintiff means by medical shoes.  Defendants also assert that Plaintiff was diagnosed with mild bunions in January 2008 but that, under current ADC criteria, inmates are not provided with tennis shoes for bunions; however, they can buy tennis shoes in the inmate store.  (DSOF ¶ 13.)

As to the shower shoes, Plaintiff is correct that, contrary to Defendants' assertion, at least one medical provider requested permission for shower shoes.  (Rowe Aff. at 18.) Defendants assert that shower shoes are a standard issue item given to inmates by ADC security when they enter ADC and that such shoes may be purchased in the inmate store for less than $3.00.  In fact, Rowe attests that such is his "understanding." (Id. at ¶ 32.)  Even if this is insufficient to show his personal knowledge, see Bank Melli Iran v. Pahlavi, 58 F.3d 1406, 1412-13 (9th Cir. 1995) (declaration on information and belief are entitled to no weight where declarant lacks personal knowledge), in their reply, Defendants refer to ADC Department Order 909, Inmate Property, Attach. A, Store Property List.  (Doc. #185 at 1-2.[4]) Attachment A does in fact show that shower shoes can be purchased at the inmate store, although it does not appear to show the price.

The Court finds that any deprivation of tennis shoes that Plaintiff may have experienced from October 2006 to November 2007, when he received his tennis shoes, does not constitute deliberate indifference to a serious medical need.[5]  The record shows that

---

[4] http://www.azcorrections.gov/Hema_PO_DO909.aspx#ATTACHMENTS.

[5] The only issues regarding SNOs for shoes are those raised in the Supplemental Pleading filed in October 2008; claims raised in the Amended Complaint, filed in October 2006, were dismissed for failure to exhaust administrative remedies or as time barred. (Doc.

Plaintiff alleged that his shoes were too tight, he had foot fungus, his toe nails were too long, and he had a bunion.[6]  The Court finds that these are either not serious medical needs or the evidence shows they were adequately treated.  And Plaintiff provides no evidence that any Defendant delayed Plaintiff's receipt of his tennis shoes.  Likewise, the lack of shower shoes does not constitute deliberate indifference.  As with the front-cuffing issue, any SNO for these items is not sufficient to show that failure to provide them would result in significant injury to Plaintiff's health or that any Defendant was aware of a serious risk of injury and ignored it.

### (c)    Mattress

The Court will grant summary judgment but notes that the facts surrounding the medical mattress are very confusing and were poorly presented by both parties.  It appears that Plaintiff is complaining about a delay in obtaining the original mattress and a refusal to replace it when it was lost.

 Plaintiff asserts that an SNO for a mattress was issued on June 7, 2006  and it was about two months before he received it.  He alleges that the delay was the result of Defendants' policy and custom of delegating the task of providing inmates medically prescribed bedding to the unit's security staff, and Defendants' evidence also shows that bedding was provided by security.  But Plaintiff presents no evidence that any Defendant was responsible for such a policy or was deliberately indifferent and caused a delay.  Moreover, claims raised in the Amended Complaint regarding the mattress issues were dismissed.  (Doc. #171.)

As to the denial of a replacement mattress, after searching through the record, the Court has ascertained that Plaintiff alleges that he had a "medical mattress" from August 3, 2006, until December 1, 2007, when it disappeared at the time inmates were moved from one unit to another at the Tucson complex.  (Doc. #184, Pl's. Decl. ¶ 12.)  He asserts that he

#171.)

[6]In addition, he may be asserting that his need for tennis shoes is related to his back issues, but he does not make that clear or explain the relationship.

submitted an HNR for a replacement but was refused by medical. (Id.) The evidence shows that this is one of the SNOs that Macabuhay submitted to the Medical Review Committee; it was denied as not medically required. (Doc. #184, Ex. E9.)

The Court will grant summary judgment to Defendants. First, there is nothing in the record to establish that Plaintiff had a special medical mattress; at most he seems to have been provided a new mattress or a double mattress. (Id., Ex. D5, Grievance Response, dated March 21, 2008.) The record shows that health care providers do not generally order mattresses. Moreover, there is nothing to suggest that Plaintiff had no mattress at all; rather, he did not have the mattress he wanted. This does not rise to the level of a Eighth Amendment deprivation of "the minimal civilized measure of life's necessities." See Farmer, 511 U.S. at 834. And as with the other issues, that Plaintiff was issued an order for a new mattress in the past is not sufficient to show that failure to provide one later would result in significant injury to Plaintiff's health or that any Defendant was aware of a serious risk of harm and ignored it.

In addition, the Court finds that Defendants are entitled to qualified immunity on the issue of the SNOs. Although Plaintiff had a well-established right to appropriate medical care, the Court is unaware of any case holding that Plaintiff had a right to front-cuffing, tennis shoes, shower shoes, and a new mattress based on the medical conditions he alleges and absent admissible evidence that failure to provide these items was medically unacceptable. See Jackson, 90 F.3d at 332. The record demonstrates no genuine dispute of fact as to the adequacy of the treatment for his back and feet and, therefore, no genuine dispute as to the reasonableness of Defendants' conduct. Defendants are entitled to qualified immunity on the claims for failure to provide the requested SNOs.

Because no claims remain, the Court will terminate the action.

**IT IS ORDERED:**

(1)     Defendants' Motion for Summary Judgment (Doc. #172) is **granted**.

///

///

1    (2)    Plaintiff's remaining claims are dismissed with prejudice, the action is

2    terminated, and the Clerk of Court must enter judgment accordingly.

3    DATED this 20th day of May, 2010.

4

5    _____

6    Cindy K. Jorgenson
     United States District Judge

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28